STATE of Wisconsin, Plaintiff-Respondent,

v.

Ronald CRAMER, Defendant-Appellant-Petitioner.

Supreme Court

*No. 78-766-CR. Argued September 4, 1980.—Decided September 30, 1980.*

(Also reported in 296 N.W.2d 921.)

For the appellant-petitioner the cause was argued by *Charles Bennett Vetzner*, assistant state public defender, of Madison, with whom on the briefs was *Thomas K. Zander*, assistant state public defender of Milwaukee.

For the respondent the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

STEINMETZ, J.  On April 16, 1973, Ronald J. Cramer was convicted in Milwaukee county circuit of indecent behavior with a child contrary to sec. 944.11(1), Stats. As an alternative to sentencing him to prison, the court ordered his commitment to the Department of Health and Social Services (department) under the provisions of ch. 975.

On June 6, 1978, pursuant to sec. 975.13, Stats.,[1] the department ordered that its control over Cramer be ex-

---

[1] "975.13 **Continuance of control; order and application for review by the committing court.** If the department is of the opinion that discharge of a person from its control at the time provided above would be dangerous to the public for reasons set forth in s. 975.14, it shall make an order directing that he remain subject to its control beyond that period; and shall make application to the committing court for a review of that order at least 90 days before the time of discharge stated."

tended because his discharge would be dangerous to the public. Such an extension, if confirmed by the circuit court, extends the right of the department to control the defendant for five years beyond the date of the court confirmation. Sec. 975.15(1).[2]

The required hearing reviewing the order of the department was held, with a jury, on September 19, 1978. At that hearing, the state moved *in limine* to prohibit evidence as to the defendant's suggested terms and conditions of parole. This motion was granted. The defendant moved *in limine* to exclude testimony from psychologists and psychiatrists who had treated the defendant on the grounds that such evidence was privileged. This motion was denied.

At the conclusion of the hearing, the jury was instructed, over the objections of the defense, that the issue before them was whether "discharging the defendant at this time would be dangerous to the public" and the verdict was framed:

"Do you find from the evidence presented that discharging the defendant from the control of the department at this time would be dangerous to the public because of the defendant's mental or physical deficiency, disorder, or abnormality?"

The jury answered in the affirmative.

The jury was instructed that the definition of "dangerous" was "not limited to physical harm [to others],

[2] "975.15 **Review by court of subsequent orders of the department.** (1) When an order of the department is confirmed as provided in s. 975.14 the control of the department over the person shall continue, but unless he is previously discharged, the department shall within 5 years after the date of such confirmation make a new order and a new application for review thereof in accordance with this chapter, subject to s. 57.072. Such orders and applications may be repeated as often as in the opinion of the department it may be necessary for the protection of the public."

but also includes the potential that the defendant would commit psychological harm [to others]."

In accordance with the verdict, the court entered an order on November 22, 1978, confirming the department's order for an extension of commitment.

The defendant appealed the order of the circuit court to the court of appeals. On August 24, 1979, that court issued an opinion affirming the order of the circuit court.

While his appeal was pending before the court of appeals, the defendant turned to the circuit court for Dodge county asking for a conditional release. On July 19, 1979, the court in Dodge county ordered the conditional release of the defendant who was, consequently, released from Central State Hospital on July 20, 1979. These proceedings were unknown to the court of appeals and to the attorneys for the state involved in the appeal until after the defendant's release.

Subsequent to his conditional release the defendant was arrested in Milwaukee county and convicted of attempted second-degree sexual assault in violation of secs. 940.225 (2) (a) and 939.32, Stats. On January 12, 1980, the defendant was sentenced to the state prison at Waupun for a term not to exceed five years.

Four issues are presented on this appeal:

(1) Is this case moot due to the defendant's release obtained from the Dodge county court after the extension of control ordered by the Milwaukee county court?

(2) Was the trial court in error when it instructed the jury that the defendant's discharge from control was at issue rather than his release on parole?

(3) Did the trial court commit error by allowing the defendant's psychotherapists to testify despite an assertion of privilege?

(4) Did the trial court commit error in defining "dangerousness" to include the threat of psychological as well as physical harm to others?

## I. MOOTNESS

While this case was pending before the court of appeals, the defendant obtained a conditional release from the circuit court for Dodge county. This release rendered this case moot, not only for purposes of the present review, but also in the appeal to the court of appeals.

This court's rulings on the issues in this case will have no practical effect on this appellant since he succeeded in gaining a release from another court in a proceeding which is not here on review. This court has previously announced that it will not ordinarily consider questions which have become moot due to a change in circumstances. *State ex rel. Renner v. H&SS Dept.,* 71 Wis.2d 112, 116, 237 N.W.2d 699 (1976). However, there are exceptions to this rule. This court will consider questions which are otherwise moot in situations, for example, where the question is one of great public importance, *Ibid.* at 116, or of public interest, *Mueller v. Jensen,* 63 Wis.2d 362, 217 N.W.2d 277 (1974); where the problem is likely to recur and is of sufficient importance to warrant a holding which will guide trial courts in similar circumstances, *Oshkosh Student Asso. v. Board of Regents,* 90 Wis.2d 79, 279 N.W.2d 740 (1979); where reversal would absolve appellants from payment of costs, *Smith v. Whitewater,* 251 Wis. 306, 29 N.W.2d 33 (1947); would alter the liability on a bond, *Jefferson Gardens, Inc. v. Terzan,* 216 Wis. 230, 257 N.W. 154 (1934); or where the parties by stipulation have preserved the right to proceed with a final determination. *Katz v. Miller,* 148 Wis. 63, 133 N.W. 1091 (1912).

The issues in this case are of public interest and a resolution of these issues will serve as a useful guide to trial courts in similar situations. This case also provides the court with a sufficient record on the issues so the court can rule.

## II.  DISCHARGE OR PAROLE RELEASE

The defendant claims the trial court was in error by submitting the issue of whether the defendant was dangerous to the public and therefore should not be discharged from the control of the department. The defendant alleges the issue that should have been submitted to the jury was whether the defendant would be dangerous to the public if released on parole.

On April 16, 1973, Ronald J. Cramer, the defendant-appellant (defendant) plead guilty to and was convicted of one count of indecent behavior with a child, a violation of sec. 944.11(1), (2), Stats. On June 6, 1973, the defendant was committed to the custody of the state Department of Health and Social Services (department) pursuant to sec. 975.06, by order of Milwaukee County Circuit Judge Hugh R. O'Connell.

On June 6, 1978, the secretary of the department ordered that the defendant remain subject to the department's control beyond his mandatory release date, *i.e.*, the date by which he would have been paroled by operation of secs. 975.12[3] 53.11 and 53.12, Stats. On the same

[3] "975.12 **Termination of control.** (1) Every person committed to the department under this chapter who has not been discharged as provided in this chapter shall be discharged at the expiration of one year or the expiration of the maximum term prescribed by the law for the offense for which he or she was committed subject to sub. (2) and the credit provisions of s. 973.155, whichever period of time is greater, unless the department shall have acted under s. 975.13 to continue him or her subject to its control. For the purpose of this subsection, sentence shall begin at noon of the day of the commitment by the court to the department.

"(2) All commitments under s. 975.06 for offenses committed after July 1, 1970, shall be subject to ss. 53.11 and 53.12. If the department is of the opinion that release on parole pursuant to s. 53.11(7)(a) would be dangerous to the public, it shall either make an order directing that the person remain subject to its control or make an order suspending the provisions of s. 53.11 (7)(a) and in either case shall make application to the commit-

date, the department applied to the Milwaukee county circuit court for a review of this order of extension, pursuant to sec. 975.12.

At the time the department petitioned the trial court for a review of its order extending control over the defendant, the defendant was approximately three months short of his mandatory release (MR) date. For a sex crime committee, the MR date is computed as being the maximum sentence for the offense for which the committee was convicted (in the defendant's case, 10 years) minus "good time" provided by the operation of secs. 975.12(2), 53.11 and 53.12, Stats., and minus credit for precommitment confinement, sec. 973.155. If it had not been for the action of the department in ordering an extension of control over the defendant and seeking a review thereof, the defendant would have been placed on MR parole on August 7, 1978.

Sec. 975.12(2), Stats., gave the department two choices as the defendant's MR date for parole was imminent and if the department was "of the opinion that release on parole pursuant to s. 53.11(7)(a) would be dangerous to the public."[4] The choices of the department in that event were:

"[1] [I]t shall either make an order directing that the person remain subject to its control *or* [2] make an

ting court for a review of that order proceeding as provided in this chapter."

[4] Sec. 53.11(7)(a), Stats., provides:

"(7)(a) An inmate or parolee having served the term for which he or she has been sentenced for a crime committed after May 27, 1951, less good time earned under this chapter and not forfeited as provided in this section, shall be released on parole or continued on parole, subject to all provisions of law and department regulations relating to paroled prisoners, until the expiration of the maximum term for which he or she was sentenced without deduction of such good time, or until discharged from parole by the department, whichever is sooner. An inmate or parolee shall be given credit for time served prior to sentencing under s. 973.155, including good time under s. 973.155(4)."

order suspending the provisions of s. 53.11(7)(a) and in either case shall make application to the committing court for a review of that order proceeding as provided in this chapter." (Emphasis supplied.)

■

The department in this case chose to issue an order directing that the defendant remain subject to its control. This is the issue tried properly by the jury and the jury's verdict agreed with the department's determination that discharging the defendant from the control of the department was dangerous to the public based on the evidence received on the trial as to the defendant's mental or physical deficiency, disorder or abnormality.

Contrary to the defendant's interpretation of sec. 975.12(2), Stats., the jury was not trying whether the defendant would be dangerous to the public on parole release, but whether discharge of the defendant from control of the department would be dangerous to the public.

The correct issue was tried by the jury on the verdict form submitted which was appropriate under the statute.

Therefore, the defendant's proposed evidence as to his relative lack of dangerousness to the public on parole was irrelevant to the issue of discharge from control of the department. The trial court was correct in granting the state's motion *in limine* in respect to such offered testimony.

Given the option in sec. 975.12(2), Stats., as the defendant's MR date approached, the department chose to have the confirmation of its order regarding the discharge issue considered rather than set aside the sections involving parole. The legislature evidently realized the problems of a jury determining the issues of relative dangerousness of an individual to the public where the department did not believe parole appropriate at the MR date. If the standard in this proceeding were the defendant's dangerousness while on parole, many additional

issues would become relevant at the hearing. For example, would a jury set in its verdict the conditions and terms of parole and therefore impose on the department their implementation? Is the term relative dangerousness subject to definition? Is the standard of relative dangerousness available under the statute? These are some of the issues which the legislature avoided by giving the department the option of proceeding under a standard of either dangerousness when discharged or dangerousness when on parole.

The 90 day provision of sec. 975.13, Stats., applied only to the time before the maximum discharge date not before the mandatory release date for parole. Therefore, this order of the department was timely since this defendant's discharge date was not until 1983.

## III. MEDICAL WITNESS PRIVILEGE

At his continuation of control hearing, the defendant objected to evidence introduced by the state from a psychotherapist and two physicians who had treated the defendant while he was committed to state mental health institutions pursuant to ch. 975, Stats. The defendant claims that the testimony of these witnesses was privileged and should have been excluded. The basis for the claimed privilege is sec. 905.04(2), which states:

"(2) GENERAL RULE OF PRIVILEGE. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition among the patient, the patient's physician, the patient's psychologist or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician or psychologist."

■

An exception to this privilege is contained in sec. 905.04 (4) (a), Stats., which states:

"(4) EXCEPTIONS. (a) *Proceedings for hospitalization.* There is no privilege under this rule as to communications and information relevant to an issue in proceedings to hospitalize the patient for mental illness, if the physician or psychologist in the course of diagnosis or treatment has determined that the patient is in need of hospitalization."

The applicability of sec. 905.04, Stats., to a continuation of control hearing under sec. 975.14,[5] has been the subject of previous litigation before this court. In *State v. Hungerford,* 84 Wis.2d 236, 267 N.W.2d 258 (1978) this court ruled that the whole of sec. 905.04 applies to continuation of control hearings made pursuant to sec.

---

[5] "975.14 **Action of committing court upon application for review; reasons for continuance of control by the department.** (1) If the department applies to the committing court for the review of an order as provided in s. 975.13 the court shall notify the person whose liberty is involved, and, if the person is not sui juris, the person's parent or guardian as practicable, of the application, and shall afford the person opportunity to appear in court with counsel and of process to compel the attendance of witnesses and the production of evidence. The person may have a physician or clinical psychologist of the person's choosing examine the person and the medical records in the institution to which confined or at some suitable place designated by the department. If unable to provide counsel, the court shall appoint counsel to represent the person. Section 975.06(1) shall govern the procedure of the hearing.

"(2) If, after a hearing, it is found that discharge from the control of the department of the person to whom the order applies would be dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality the court shall confirm the order. If it is found that discharge from the control of the department would not be dangerous to the public for the causes stated, the court shall order that the person be discharged from the control of the department at the time stated in the original commitment."

975.14. *Hungerford* held that the general rule of privilege contained in sec. 905.04(2) applies to control continuation hearings under sec. 975.14, but, since such hearings are "proceding(s) for hospitalization" under sec. 905.04(4)(a), the testimony of physicians and psychotherapists who have treated the defendant was admissible.

The defendant claims the *Hungerford* rule was changed by statute. The amendment at issue is in sec. 51.20(16)(g), Stats.[6] It requires that in cases where a patient is subject to involuntary civil commitment and obtains a re-examination of that commitment under his own petition (or the petition of his guardian) "the privileges provided in ss. 905.03 and 905.04 shall apply." The defendant Cramer argues that this provision is applicable to his hearing since sec. 51.20(16)(j) states that "This

---

[6] Sec. 51.20, Stats., provides in part:

"(16) REEXAMINATION OF PATIENTS. (a) Except in the case of alcoholic commitments under s. 51.45(13), any patient who is involuntarily committed for treatment under this chapter, may on the patient's own verified petition, except in the case of a minor who is under 14 years of age, or on the verified petition of the patient's guardian, relative, friend, or any person providing treatment under the order of commitment, request a reexamination or request the court to modify or cancel an order of commitment.

". . .

"(g) Upon the filing of the examiners' reports the court shall fix a time and place of hearing and cause reasonable notice to be given to the petitioner, the treatment facility, the patient's legal counsel and the guardian of the patient, if any, and may notify any known relative of the patient. Subsections (10) to (13) shall govern the procedure to be used in the conduct of the hearing, insofar as applicable. The privileges provided in ss. 905.03 and 905.04 shall apply to reexamination hearings.

". . .

"(j) This subsection applies to petitions for reexamination which are filed pursuant to chs. 971 and 975."

subsection applies to petitions for reexamination which are filed pursuant to chs. 971 and 975."

The defendant's hearing was conducted under sec. 975.14, Stats., as a court review of an order of the department. As such it was not within the scope of sec. 51.20(16)(j), which is limited to proceedings brought under "petitions for reexamination."

Clearly the cross-reference between chs. 51, 971 and 975 applies only to petitions brought at the option of the patient or his guardian and not to those reviews which it is the required duty of the department to instigate under secs. 975.12, 975.13 or 975.14, Stats.

As this court made clear in *Hungerford,* chs. 51 and 975 of the statutes have different goals and serve different purposes. As was stated there: " 'A sexual deviate is confined because he is dangerous to the public, and the mentally ill, infirm or deficient person is confined primarily for his own benefit and treatment.' " *State v. Hungerford,* 84 Wis.2d at 245.

## IV. DANGEROUSNESS

At the hearing the jury was instructed that it must decide whether the defendant was "dangerous to the public." It was also instructed that:

"The term 'dangerous' includes the potential that the defendant would commit physical harm to others. However, the term 'dangerous' as applicable here is not limited to physical harm, but also includes. the potential that the defendant would commit psychological harm. An example of psychological harm would include the potential that if the defendant were discharged, he would seek out minors for sexual purposes and that such an encounter would have harmful effects on the normal sexual development of such minors."

This definition is in accord with this court's decision in *State v. Torpy*, 52 Wis.2d 101, 187 N.W.2d 858 (1971). In that case, we held that in a review of an order for continuance of control under the sex crimes chapter, the jury would consider evidence that the defendant's behavior, if discharged, would have harmful psychological effects on others, whether or not it was likely that he would resort to violence. *State v. Torpy*, 52 Wis.2d at 116–17.

The defendant argues that this degree of dangerousness should have been tested under the definition used in civil commitment proceedings. This definition is set forth in sec. 51.20(1), Stats.,[7] as "a substantial probability of physical harm" to the defendant's self or

---

[7] "51.20 **Involuntary commitment for treatment.** (1) PETITION FOR EXAMINATION. (a) Every written petition for examination shall allege that the subject individual to be examined:

"1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and

"2. Is dangerous because the individual:

"a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

"b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do such physical harm; or

"c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a very substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury may not be deemed very substantial under this subparagraph if reasonable provision for the subject individual's protection is available in the community or if the individual is appropriate for placement under s. 55.06. The subject individual's status as a minor does not automatically establish a very substantial probability of physical impairment or injury under this subparagraph."

others. He claims that this standard is applicable to his case by operation of sec. 51.20(1)(am), which reads:

"If the individual has been the subject of inpatient treatment for mental illness, developmental disability or drug dependency as a result of a voluntary admission or a commitment or placement ordered by a court under this section or s. 55.06 or ch. 971 or 975 immediately prior to commencement of the proceedings, the requirements of specific recent overt acts, attempts or threats to act or pattern of recent acts or omissions may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."

The defendant argues that this section indicates a continuation of control hearing in review of an order of the department under sec. 975.13, Stats., is substantially equal to a commitment hearing under ch. 51 and ought to be conducted under ch. 51 standards. The defendant's logic is that a ch. 51 examination will never follow a ch. 975 commitment, since, if a person who was committed under ch. 975 is still a danger to the public on his release date, the department will always choose to proceed under secs. 975.12, 975.13 or 975.14, and never under ch. 51. The situation provided in sec. 51.20(1)(am) would thus never occur and the statute would be illogical surplusage.

In *State v. Gebarski*, 90 Wis.2d 754, 280 N.W.2d 672 (1979), this court held quoting *Hungerford, supra,* " '. . . it is clear that the legislature did not intend all of the provisions of the civil commitment statute relating to the reexamination of a civilly committed person to apply to hearings for the extension of control over a sexual deviate.' " 90 Wis.2d at 766. As we have stated earlier in this opinion, chs. 51 and 975 serve different purposes and any connection between these chapters should be construed as narrowly as possible.

We therefore agree with the court of appeals that the jury was properly instructed that "danger to the public" as used in secs. 975.12, 975.13 and 975.14, Stats., includes the danger of inflicting psychological as well as physical harm.

*By the Court.*—Decision of the court of appeals affirmed.